# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
_____  )
                                 )
PRINCE GEORGE'S HOSPITAL         )
CENTER,                          )
                                 )
              Plaintiff,         )
                                 )
        v.                       )        Civil Action No. 03-CV-2392 (KBJ)
                                 )
ADVANTAGE HEALTHPLAN INC.,       )
                                 )
              Defendant.         )
                                 )
_____  )
```

## MEMORANDUM OPINION

Plaintiff Prince George's Hospital Center ("PGHC") originally filed this action against Defendant Advantage Healthplan Inc. ("Advantage") in the Superior Court of the District of Columbia more than a decade ago. PGHC maintains that Advantage breached agreements with the District of Columbia that required Advantage to reimburse healthcare providers such as PGHC for the provision of emergency care services to certain District residents. (Complaint ("Compl."), ECF No. 1-1, ¶¶ 5-10.) Before this Court at present is a motion for reconsideration that Advantage has filed. Advantage asks this Court to reconsider the Court's Opinion and Order of June 6, 2012 (ECF No. 17), which grants in part and denies in part Advantage's motion to dismiss the complaint. *See Prince George's Hosp. Ctr. v. Advantage Healthplan Inc.*, 865 F. Supp. 2d 47, 48 (D.D.C. 2012) (Roberts, J.). In the challenged Opinion and Order, the Court held that PGHC can proceed with a cause of action against Advantage as a third-party beneficiary of the contracts between Advantage and the District. *Id.* at 59.

1

For the reasons stated below, Advantage's motion for reconsideration is **GRANTED**, and so, too, is its motion to dismiss. Accordingly, as set forth in the separate order that accompanies this opinion, this case is hereby **DISMISSED** in its entirety.

## I. <u>BACKGROUND</u>

This case arises out of certain provisions of Title XIX of the Social Security Act pertaining to the federal Medicaid program, commonly known (and referred to herein) as the "Medicaid statute." *See* 42 U.S.C. §§ 1396-1396w. Pursuant to section 1396u-2 of the Medicaid statute (the "managed care provision"), a state may require Medicaid-eligible individuals to enroll in certain health insurance plans that Managed Care Organizations ("MCOs") administer. *Id.* § 1396u-2(a)(1)(A)(i). States ordinarily enter into contracts with MCOs to supply insurance to Medicaid-eligible individuals, 42 U.S.C. § 1396b(m), and the managed care provision imposes certain requirements on the contractual agreements that states and MCOs form. *See generally id.* § 1396u-2. Most importantly for present purposes, one section of the managed care provision mandates that a contract between a state and an MCO must contain a term that requires the MCO "to provide coverage for emergency services . . . without regard to prior authorization or the emergency care provider's contractual relationship with" the MCO. *Id.* § 1396u-2(b)(2)(A)(i) (the "emergency services section" of the managed care provision).[1]

---

[1] The Supreme Court has generally described Medicaid as "a cooperative federal-state program through which the Federal Government provides financial assistance to States so that they may furnish medical care to needy individuals." *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 502 (1990) (citations omitted). "[P]articipating States must comply with certain requirements . . . [t]o qualify for federal assistance[.]" *Id.* For example, "a State must submit to the Secretary [of Health and Human Services] and have approved a 'plan for medical assistance,'" and this state plan must include "a scheme for

Defendant Advantage is an MCO that contracted with the District of Columbia in 2000 and 2002 to provide health insurance and related services to Medicaid-eligible residents of the District of Columbia. *Prince George's Hosp. Ctr.*, 865 F. Supp. 2d at 49.[2]  The contracts between Advantage and the District—pursuant to which enrolled Medicaid-eligible District residents became "Advantage plan members"—generally incorporated the requirements of the managed care provision of the Medicare statute. *See id.* at 57-58.  Moreover, in addition to contracting with the District to provide insurance for Medicaid-eligible District residents, Advantage also entered into contracts with a number of hospitals and healthcare providers in the greater D.C. metro area for the provision of medical services to Advantage's plan members.  (Compl. ¶ 6.)  The hospitals and healthcare providers that had contracts with Advantage were known as "in-network" providers under Advantage's plan.  (*Id.*)  Hospitals and providers that had no contract with Advantage—such as PGHC—were considered "out-of-network" providers.  (*See id.* ¶ 7.)  Consistent with the emergency services section of the managed care provision of the Medicaid statute, however, the contracts between Advantage and the District specifically stated that Advantage "shall be responsible for covering emergency services, as defined above, provided to Enrollees at either in-network or out-of-network providers, without regard to prior authorization." *Prince George's Hosp. Ctr.*, 865 F. Supp. 2d at 57.[3]

---

reimbursing health care providers for the medical services provided to needy individuals." *Id.* (citations omitted).

[2] For all purposes relevant to this case, the term "state" as used in the Medicaid statute includes the District of Columbia.  *See, e.g.*, 42 U.S.C. § 1396a(e)(13)(F)(v)(I) ("The term 'State' means 1 of the 50 states or the District of Columbia.").

[3] As noted above, the emergency services section of the managed care provision of the Medicaid statute requires that a participating MCO insure plan members for medical care that the member receives from

PGHC's complaint, which was originally filed in D.C. Superior Court on October 14, 2003, alleges that between July 2001 and August 2002, PGHC provided treatment for emergency medical conditions to five District residents who were members of Advantage's plan under the managed care contracts. (Compl. ¶ 9.) The complaint asserts that PGHC rendered these services without realizing that each of the patients had Advantage insurance coverage, due to incorrect or incomplete information that the patients provided to PGHC. (*Id.* ¶¶ 12, 16, 31-33, 40-41.) PGHC alleges that, upon learning that each patient was an Advantage plan member, it promptly notified Advantage of the patient's emergency treatment and sought reimbursement (*id.* ¶¶ 17, 27, 29, 33, 36, 42, 46, 54, 56), but Advantage denied payment in each case (*id.* ¶¶ 19, 29, 36, 46, 56). The complaint claims that PGHC is entitled to payment from Advantage for the medical care that PGHC provided to each of the patients on three bases: (1) the equitable principle of subrogation, (2) the managed care provision of the Medicaid statute itself, and (3) the common law theory that PGHC is a third-party beneficiary of the contracts between Advantage and the District. (*Id.* ¶¶ 4, 18, 28, 35, 45, 55.) Advantage removed the case from D.C. Superior Court to federal district court on November 19, 2003, pursuant to 28 U.S.C. § 1441. (Notice of Removal, ECF No. 1, at 3).[4]

---

a healthcare provider in an emergency, regardless of whether the emergency healthcare provider is in-network or out-of-network for that MCO's plan. 42 U.S.C. § 1396u-2(b)(2)(A)(i). Likewise, the Emergency Medical Treatment and Active Labor Act (EMTALA) requires hospitals such as PGHC to treat individuals who come to the hospital with an emergency medical condition, regardless of the individual's insurance coverage or ability to pay for the treatment. *See* 42 U.S.C. § 1395dd.

[4] As a basis for removal jurisdiction, Advantage maintained that the action presents a federal question, (Notice of Removal, ECF No. 1, at 2-3 (citing 28 U.S.C. § 1331)); namely, whether the Medicaid statute required Advantage to reimburse PGHC for the emergency services that it had rendered. (*See* Compl. ¶¶ 4, 5, 7.)

On December 12, 2003, Advantage filed a motion to dismiss the complaint, arguing that PGHC had failed to state a claim upon which the Court could grant relief. (Def.'s Mem. of P. & A. in Supp. of its Mot. to Dismiss ("Def.'s Mem."), ECF No. 7, at 1.) In its brief in support of the motion, Advantage attacked each of the theories of recovery that PGHC articulated in its complaint. Advantage argued, first, that PGHC had no right of subrogation because it had failed to plead facts necessary to establish that PGHC had paid a "debt" to Advantage on behalf of the patients, or even that such a debt existed. (*Id.* at 10.) Advantage further contended that PGHC had failed to identify any statutory authority granting it a private right of action under the Medicaid statute or otherwise. (*Id.* at 14-15.) Finally, Advantage asserted that PGHC could not proceed with its third-party beneficiary theory of liability because PGHC was not an intended beneficiary of the Medicaid-related contracts between Advantage and the District. (*Id.* at 15-17.)

On June 6, 2012, the Court issued an opinion granting in part and denying in part Advantage's motion to dismiss. *Prince George's Hosp. Ctr.*, 865 F. Supp. 2d at 49. The Court dismissed PGHC's reimbursement claims based on the principle of equitable subrogation primarily because PGHC had failed to demonstrate that "the patients would have claims for monetary compensation against Advantage which would result in a 'debt' that [PGHC] extinguished[.]" *Id*. at 52. The Court also dismissed PGHC's claim for reimbursement based on the terms of the Medicaid statute. *Id*. at 56. Based on substantial precedent, the Court reasoned that the Medicaid statute contained no implied private right of action, *id.* at 54 (collecting cases and applying the four-factor test of *Cort v. Ash*, 422 U.S. 66, 78 (1975)), which meant that PGHC could not bring a claim to

enforce Advantage's obligations directly under the statutory provision that requires MCOs to provide insurance for emergency health services that plan members receive. *Id.* at 52-56.

With respect to PGHC's third and final claim for reimbursement, however, the Court held that PGHC was entitled to seek payment from Advantage as a third-party beneficiary of the contract between Advantage and the District. *Id.* at 59. In reaching this conclusion, the Court first noted that, under D.C. law, PGHC's status as an alleged third-party beneficiary turned on whether PGHC was an "intended" beneficiary of the contract even though it was not a party to the contract. *Id.* at 57 (quoting *Sealift Bulkers, Inc. v. Republic of Armenia*, No. 95-1293, 1996 WL 901091, at *4 (D.D.C. Nov. 22, 1996) ("Under general contract principles, a third-party beneficiary of a contract may bring an action against the principal parties to that contract only when the parties to the contract intended to create and did create enforceable contract rights in the third party.")). The Court then observed that "[u]nder the contracts [with the District], Advantage ha[d] promised to provide payment to in-network and out-of-network providers under certain circumstances[,]" and that "[t]hese promises to pay providers establish that the parties intended in-network and out-of-network providers to benefit from the contracts." *Id.* (citations omitted). The Court continued:

> In-network and out-of-network providers are intended beneficiaries under the contracts because in order to effectuate the intention of Advantage and the District of Columbia in the contract—for Advantage to pay for emergency services provided by in-network and out-of-network providers—the health care provider's right to payment must be recognized.

*Id.* at 58.

After concluding that PGHC had a right to proceed against Advantage as a third-party beneficiary, the Court also addressed, and rejected, Advantage's additional arguments that PGHC had failed to exhaust its administrative remedies, and that PGHC's complaint should be dismissed for failure to provide timely notice to Advantage that PGHC had treated the patients in question. *Id*. at 59. Advantage's instant motion for reconsideration, now before this Court, concerns only the Court's conclusion that PGHC has a valid claim for reimbursement as a third-party beneficiary of the agreements between Advantage and the District.

## II.  LEGAL STANDARDS

### A. Motion for Reconsideration

Advantage has styled its motion for reconsideration as arising under Federal Rule of Civil Procedure 54(b). Rule 54(b) "governs reconsideration of orders that do not constitute final judgments in a case." *Clayton v. District of Columbia*, No. 11-1889, 2013 WL 1154098, at *13 (D.D.C. Mar. 21, 2013) (quoting *Cobell v. Norton,* 224 F.R.D. 266, 271 (D.D.C. 2004)). Rule 54(b) is the appropriate procedural mechanism for reconsideration where, as here, the challenged order grants in part and denies in part a defendant's motion to dismiss, and therefore does not constitute a final judgment. *See, e.g.*, *Clayton*, 2013 WL 1154098, at *13.

Relief under Rule 54(b) is available "as justice requires," which "amounts to determining, within the Court's discretion, whether reconsideration is necessary under the relevant circumstances." *Cobell v. Norton*, 355 F. Supp. 2d 531, 539 (D.D.C. 2005). Generally, "a court will grant [the] motion . . . only when the movant demonstrates: (1) an intervening change in the law; (2) the discovery of new evidence

not previously available; or (3) a clear error in the first order." *Zeigler v. Potter*, 555 F. Supp. 2d 126, 129 (D.D.C. 2008) (internal quotation marks and citations omitted).

### B. Motion to Dismiss

Advantage's motion for reconsideration is premised on the contention that the Court made a clear error in denying Advantage's motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). Consequently, the legal standards for determining a Rule 12(b)(6) motion are also implicated here. In short, a Rule 12(b)(6) motion tests the legal sufficiency of a complaint. *Browning v. Clinton,* 292 F.3d 235, 242 (D.C. Cir. 2002). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).

In deciding a motion to dismiss, the Court must "accept the plaintiff's factual allegations as true and construe the complaint liberally, grant[ing] plaintiff[] the benefit of all inferences that can be derived from the facts alleged[.]" *Browning,* 292 F.3d at 242 (internal quotation marks omitted) (alterations in original). "But the Court need not accept inferences drawn by plaintiff if those inferences are not supported by the facts set out in the complaint, nor must the court accept legal conclusions cast as factual allegations." *Hettinga v. U.S.*, 677 F.3d 471, 476 (D.C. Cir. 2012) Moreover, if the facts as alleged and liberally construed fail to establish that a plaintiff has stated a claim upon which relief can be granted, the Rule 12(b)(6) motion must be granted. *See, e.g.*, *American Chemistry Council, Inc. v. U.S. Dep't of Health & Human Servs.*, 922 F. Supp. 2d 56, 61 (D.D.C. 2013).

III.   **<u>DISCUSSION</u>**

Advantage seeks reconsideration of the Court's conclusion that PGHC qualifies as a third-party beneficiary of the Medicaid-related contracts between Advantage and the District and, therefore, that PGHC's complaint states a valid claim for entitlement to reimbursement under those contracts. It is undisputed that PGHC's ability to sue for enforcement of the contractual reimbursement provisions at issue turns on whether the contracting parties (Advantage and the District) intended to benefit third-party healthcare providers like PGHC. *See Oehme, van Sweden & Assocs., Inc. v. Maypaul Trading & Servs. Ltd.*, 902 F. Supp. 2d 87, 100 (D.D.C. 2012) ("Third-party beneficiary status requires that the contracting parties had an express or implied intention to benefit directly the party urged to be a third-party beneficiary." (internal quotation marks and citation omitted)). Therefore, this Court must first examine the specific contractual provisions at issue to determine the intent of the contracting parties in this regard.

**A. The 2000 and 2002 Medicaid-Related Contracts Between Advantage and the District**

As noted above, Advantage entered into two contracts with the District in 2000 and 2002 pursuant to the managed care provisions of the Medicaid statute. The contracts, which were negotiated individually, cover not only the basic rights and obligations of the contracting parties, but also contain a number of provisions that the Medicaid statute requires states to include in contracts with MCOs. In relevant part, the 2000 contract states that Advantage "shall at all times . . . meet the conditions of participation" outlined in the Medicaid statute (including the emergency services section of the managed care provision), and that Advantage must "reimburse emergency facilities," whether in-network or out-of-network, for emergency services that those

facilities provide to Advantage plan members.  (*See* Ex. 1 to Def.'s First Mot. to Dismiss (2000 Contract between Advantage and the District) ("2000 Contract"), ECF No. 6-1, at 3, 7.)[5]  The contract that Advantage and the District signed in 2002 similarly incorporates the emergency services section of the managed care provision, stating that Advantage "shall be responsible for covering emergency services. . . provided to Enrollees at either in-network or out-of-network providers, without regard to prior authorization."  (*See* Ex. 2 to Def.'s First Mot. to Dismiss (2002 Contract between Advantage and the District) ("2002 Contract"), ECF No. 6-2, at 75.)  Notably, although Advantage plainly promises to reimburse healthcare providers for emergency medical services provided to members of Advantage's plan under the terms of these contractual agreements, no healthcare provider is a signatory to either of these contracts.  (*See* 2000 Contract at 1 (title and signature page); 2002 Contract at 2 (same).)

Advantage now maintains that healthcare provider PGHC cannot sue as a third-party beneficiary to enforce the insurance provisions of these agreements, and that the Court erred when it previously held otherwise.  As discussed below, Advantage relies primarily on two recent cases that, in its view, provide particular insight into whether a third party has a cause of action as a beneficiary of a health services contract between a governmental entity and a provider of such services. (*See* Def.'s Mem. Of P. & A. in Supp. Of Reconsideration ("Def.'s Br."), ECF No. 22, at 2 (*citing Astra USA, Inc. v. Santa Clara County*, 131 S. Ct. 1342 (2011)); *id.* at 11-12 (*citing Medevac MidAtlantic, LLC v. Keystone Mercy Health Plan*, 817 F. Supp. 2d 515 (E.D. Pa. 2011)).)

---

[5] The contracts submitted as exhibits to Advantage's original motion to dismiss have several different sets of page numbers.  This Opinion cites to the page numbers of the ECF document, not the original contract.

**B.  Healthcare Providers As Third-Party Beneficiaries In Health Services Contracts:** *Astra USA, Inc. v. Santa Clara County, California* **and** *Medevac MidAtlantic, LLC v. Keystone Mercy Health Plan*

In *Astra USA, Inc. v. Santa Clara County*, 131 S. Ct. 1342 (2011), the Supreme Court considered a provision of the Public Health Services Act ("PHSA") that capped the amount that pharmaceutical companies could charge certain qualifying health service providers (mainly public hospitals and community health centers that treat disadvantaged communities) for drugs used to treat those providers' patients.  *See* 42 U.S.C. § 256b.  This program is generally referred to as the 340B Program, and the healthcare providers whose pharmaceutical costs are capped under the program are known as "340B Entities."  *Astra*, 131 S. Ct. at 1345.  The 340B Program was designed to enable healthcare providers that deliver health services to low-income people to obtain important drugs at a controlled cost that is lower than what the drugs would cost on the open market.  *Id.* at 1346.  Under the statutes and regulations that implement the 340B Program, drug manufacturers' participation in state Medicaid programs (and thus their eligibility for federal Medicaid dollars in other areas) is conditioned on their participation in the 340B Program.  *Id.* at 1345-46.  Moreover, in order to opt into the 340B Program, drug manufacturers must sign a form contract with the Department of Health and Human Services ("HHS") detailing the terms of their participation, including formulas for determining the price caps for drugs provided to qualifying health service providers.  *Id.* at 1348.

At issue in *Astra* was whether Santa Clara County, as the operator of several 340B Entities, had the right to sue Astra (a drug manufacturer) for allegedly overcharging the Entities for certain drugs, in violation of the program requirements

and Astra's contract with HHS. *Id.* at 1347. While the litigants conceded that there was no statutory private right of action under the PHSA, Santa Clara asserted that it had a right to sue as a third-party beneficiary of the contract between Astra and HHS. *Id.*

The Supreme Court unanimously disagreed.[6] In reaching its decision, the Supreme Court (Ginsburg, J.) first emphasized that there was "no right of action under § 340B itself." *Id.*; *see also id*. ("Congress vested authority to oversee compliance with the 340B Program in HHS and assigned no auxiliary enforcement role to covered entities."). The County argued that it could nevertheless sue to enforce the price-cap agreements *in the contracts*, which the County maintained must have been intended to benefit the Entities as the purchasers of those pharmaceuticals and therefore gave rise to a cause of action for such third-party beneficiaries. *Id.* at 1347-48. But the Court observed that the contracts merely incorporated the price-cap requirements that are set forth in the statute. *Id.* at 1348 ("The statutory and contractual obligations, in short, are one and the same."). Thus, the contracts themselves did not evidence any intention on the part of the contracting parties to benefit the Entities apart from the statutory requirements. *Id.* ("Repeatedly, the County acknowledged that § 340B is the source of the contractual term allegedly breached."). Nor could the contract's provisions reasonably be construed to give rise to a third-party beneficiary cause of action to enforce the price caps because "[p]ermitting such a suit, it is evident, would allow third parties to circumvent Congress's decision not to permit private enforcement of the statute." *Id*. at 1348 n.4. In other words, the Supreme Court reasoned that, even if the Entities benefitted from the contract's wholesale adoption of the statutory price-cap requirements, the Entities could not be deemed third-party beneficiaries with a right to

---

[6] Justice Kagan took no part in the decision.

bring suit to enforce those price-cap requirements under circumstances in which Congress had conferred no such right. *See Astra*, 131 S. Ct. at 1348 ("A third-party suit to enforce an HHS-drug manufacturer agreement . . . is in essence a suit to enforce the statute itself[,]" and "[t]he absence of a private right to enforce the statutory ceiling price obligations would be rendered meaningless if the 340B entities could overcome that obstacle by suing to enforce the contract's ceiling price obligations instead."); *see also id.* ("[W]hen a government contract confirms a statutory obligation, 'a third-party private contract action [to enforce that obligation] would be inconsistent with . . . the legislative scheme . . . to the same extent as would a cause of action directly under the statute[.]'" (alterations in original) (quoting *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003)).

In addition to concluding that it would be inconsistent with the lack of a private right of action under a statute to permit a third-party suit to enforce a contractual provision that merely incorporates a requirement of that statute, the Court also noted that, from a public policy perspective, allowing third-party suits would undermine HHS's "efforts to administer [the 340B Program] harmoniously and on a uniform, nationwide basis[,]" and thus would further contravene congressional intent. *Id.* at 1349. The Court pointed out that HHS had previously reported that it "lacks the oversight mechanisms and authority to ensure that" pharmaceutical companies comply with 340B, and that Congress's response had been to "strengthen and formalize [HHS's] enforcement authority" through the implementation of a "new adjudicative framework," rather than providing for third-party suits. *Id.* at 1350. In the Supreme Court's view, then, the conclusion that no third-party suit could be maintained followed

from a combination of factors—*to wit*, the fact that (1) the contract provisions that the third-party plaintiff sought to enforce merely incorporated statutory requirements; (2) there was no private right of action to enforce the statutory requirement that was the basis for the contract provision at issue, and (3) there was an administrative remedy apart from private lawsuits.

For different reasons, the district court in *Medevac MidAtlantic, LLC v. Keystone Mercy Health Plan*, 817 F. Supp. 2d 515 (E.D. Pa. 2011)—the second third-party beneficiary case that Advantage relies upon in making its argument that this Court should reconsider the prior third-party beneficiary ruling—reached the same result. The plaintiff in *Medevac* was an emergency services provider that, much like PGHC here, sued an MCO under a third-party beneficiary theory to recover alleged non-payments. *Id.* at 518, 532. Plaintiff Medevac was a provider of emergency air transportation services from trauma scenes to medical facilities, and the defendant, Keystone Mercy Health Plan ("KMHP"), was an MCO under the Pennsylvania Medicaid plan. *Id.* at 518-19. Medevac was not an in-network provider to KMHP, but provided emergency services to KMHP members. *Id.* at 518. KMHP refused to pay Medevac for the services rendered to the MCO's members, even though under the terms of the contract that KMHP had with the Pennsylvania Department of Public Works, it was required to pay providers (whether or not they were in-network) for emergency medical transportation services. *Id.* To recover the allegedly withheld payments, Medevac then brought suit alleging (among other things) a cause of action to enforce the contract as a third-party beneficiary of the agreement between KMHP and the Pennsylvania Department of Public Works. *Id.* at 519-520.

The District Court rejected Medevac's third party beneficiary claims on two distinct grounds. First, the court noted that the contract between KMHP and the Department of Public Works "expressly disclaims any intent to create third-party beneficiaries[.]" *Id.* at 528-29 (the contract included both KMPH's promise to reimburse for emergency care services and the statement that "[t]his agreement does not, nor is it intended to, create any rights, benefits or interest to any third party, person or organization."). Second, the court considered whether the contractual provisions that the parties adopted pursuant to the emergency services section of the managed care provision of the Medicaid statute (emergency care contract provisions that mirror those at issue here) should control over the express disclaimer as evidence of the parties' intent to benefit third parties. The court concluded that "[c]ontractual provisions ensuring compliance with existing statutory or regulatory provisions do not indicate mutual intent to benefit a non-party; [instead] they evince intent to comply with applicable law." *Id.* at 529.

## C. Analysis

As the parties have framed it, the central issue for this Court to decide in ruling on Advantage's motion for reconsideration is whether and to what extent the analyses of *Astra* and *Medevac* apply. In Advantage's view, *Astra* and *Medevac* both strongly support the conclusion that the Court erred in its previous finding that PGHC may sue as a third-party beneficiary. Advantage reads *Astra* as holding that "third-party beneficiary status cannot be conferred by contractual terms that adopt mandatory requirements found in the law, and that permitting such claims is inappropriate where the statute does not allow a private cause of action." (Def.'s Br. at 4-5.) Advantage

further contends that *Medevac* is the only case on record to consider the question of whether a healthcare provider may sue an MCO on a third-party beneficiary theory, and it arrived at essentially the same conclusion. (Def.'s Br. at 11-12.)

PGHC counters that *Astra* is distinguishable in at least three significant ways: first, the Court in *Astra* construed a different statute than the one at issue here (Pl.'s Opp'n to Mot. for Reconsideration ("Pl.'s Br."), ECF No. 23, at 3-4); second, the contracts at issue in *Astra* were standard-form contracts that HHS wrote and dispersed and are therefore unlike the highly negotiated contracts between Advantage and the District (*id.* at 4-5); and third, the relevant statute in *Astra* (the PHSA) established an independent federal regulatory body to adjudicate disputes such that no private right of action was necessary, whereas no such body exists to handle the managed care dispute here (*id.* at 5). With respect to *Medevac*, PGHC maintains that the *Medevac* court recognized the possibility of a third-party beneficiary cause of action but declined to find such a cause of action under the facts of that particular case because the contract at issue in *Medevac* included an express disclaimer of any third-party beneficiary rights. (*Id.* at 7-10.)

Given the facts and circumstances of *Astra* and *Medevac*—cases that were not raised or considered in the course of this litigation prior to the instant reconsideration motion—this Court concludes that Advantage has the better argument. First of all, it is clear that Advantage drew its contractual promise to reimburse providers for emergency medical services delivered to Advantage plan members directly from the emergency services section of the managed care provision of the Medicaid statute. As noted above, the emergency services section states that an MCO is required

> to provide coverage for emergency services (as defined in
> subparagraph (B)) without regard to prior authorization or the
> emergency care provider's contractual relationship with the
> [managed care] organization or manager[.]

42 U.S.C. § 1396u-2(b)(2)(A)(i); *see also Prince George's Hosp. Ctr.*, 865 F. Supp. 2d. at 53. This statutory section establishes a duty that is virtually indistinguishable from the obligation set forth in the contracts between Advantage and the District, which, as explained above, state that Advantage

> shall be responsible for covering emergency services, as defined
> above, provided to Enrollees at either in-network or out-of-network
> providers, without regard to prior authorization.

(2002 Contract at 75 (Section C.8.3.2.3)); *see also Prince George's Hosp. Ctr.*, 865 F. Supp. 2d. at 57. In addition, the definition of "emergency medical condition" in the 2002 Contract (the term used to define "emergency services" in the contract) is *identical* to that found in the statute. *Compare* 42 U.S.C. § 1396u-2(b)(2)(C), *with* 2002 Contract at 75 (Section C.8.3.2.1). And lest there be any remaining doubt about the provenance of the relevant contractual provisions, the 2002 Contract expressly acknowledges that its emergency care provisions were adopted "in accordance with Section 1932(b)(2)(B) of the Balanced Budget Act of 1997." (2002 Contract at 75.)[7]

Despite the clear parity between the contractual emergency care provisions at issue here and the statutory emergency care requirement, PGHC maintains that Advantage's contracts with the District were heavily negotiated, unlike the form contract at issue in *Astra*; and to this end, PGHC even provides an exhibit that catalogues various alterations that the District and Advantage made in the contracting

---

[7] The Balanced Budget Act of 1997 was the law that enacted the emergency services section of the managed care provision of the Medicaid statute. *See* Pub. L. No. 105-33 § 1932(b)(2)(B), 111 Stat. 251 (1997).

process.  (Pl.'s Br. at 4; *see also* Pl.'s Br. at Ex. 1.)  However, PGHC has also conceded that the *relevant* contract terms were merely "taken from the Medicaid statute and incorporated into the MCO contract at issue" (Pl.'s Br. at 4), and the Court cannot discern—nor does PGHC provide—any rationale for why other parts of the contract, even if highly negotiated, matter here.

Ultimately, then, the Court has no difficulty concluding that the contracts between Advantage and the District incorporated a term that required Advantage to reimburse healthcare providers for emergency medical services as a matter of statutory obligation, and thus that the inclusion of such term in the managed care contracts is not indicative of any intent on the part of the signatories to benefit PGHC beyond the requirements of the Medicaid statute. *See Astra*, 131 S. Ct at 1348 & 1348 n.4 (noting that the plaintiffs had not claimed a violation of "any independent substantive obligation arising only from the [contract]" and declining to infer an authorization for third-parties to sue "where a contract simply incorporates statutorily required terms and otherwise fails to demonstrate any intent to allow beneficiaries to en-force [sic] those terms"); *see also Medevac*, 817 F. Supp. 2d. at 529 ("Contractual provisions ensuring compliance with existing statutory or regulatory provisions do not indicate mutual intent to benefit a non-party[.]").  As previously explained, under D.C. law, "'[t]hird-party beneficiary status requires that the contracting parties had an express or implied intention to benefit directly' the party urged to be a third-party beneficiary." *Oehme*, 902 F. Supp. 2d at 100 (quoting *Fort Lincoln Civic Ass'n v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1064 (D.C. 2008)).  This Court cannot divine any such intent in the contractual emergency care provision at issue here.

Additionally, the Court finds that allowing PGHC to proceed with its third-party beneficiary action would frustrate the intent of Congress in enacting the Medicaid statute for substantially the same reasons that the Supreme Court in *Astra* found such suits would contravene congressional intent in establishing the 340B Program. Specifically, in this case as in *Astra*, Congress did not provide for a private right of action to enforce the provisions of the statute, and it also established an alternative procedure through which aggrieved parties in PGHC's position can seek to vindicate their rights. *See Astra*, 131 S. Ct. at 1348-50.

Neither party has challenged the Court's prior ruling that there is no private right of action to enforce the emergency care reimbursement obligation directly under the Medicaid statute, *Prince George's Hosp. Ctr.*, 865 F. Supp. 2d at 52-56, and this Court sees no need to retread that same ground here. However, it is worth pointing out in the context of Defendant's instant motion for reconsideration that, as the Supreme Court stated in *Astra*, "[t]he absence of a private right to enforce the statutory . . . obligations would be rendered meaningless" if PGHC could simply circumvent that obstacle by suing as a third-party beneficiary to enforce the emergency care provision of the statute, as incorporated into the contracts between Advantage and the District. 131 S. Ct. at 1348. *Astra*'s logic makes clear that a third-party beneficiary suit brought under these circumstances would impermissibly permit PGHC to sue to enforce statutory requirements in contravention of Congress's decision not to provide a private remedy for aggrieved parties in PGHC's position.

Also telling is the fact that Congress has devised an alternative system by which third-party health service providers can pursue reimbursement for emergency services

provided to an MCO's plan members when the MCO refuses to make such payments despite its statutory and contractual obligations to do so. The managed care provision contains a section that specifically provides:

> Each medicaid managed care organization shall establish an internal grievance procedure under which an enrollee who is eligible for medical assistance under the State plan under this subchapter, *or a provider on behalf of such an enrollee*, may challenge the denial of coverage of *or payment* for such assistance.

42 U.S.C. § 1396u-2(b)(4) (emphasis added). Because the managed care provision also provides that an individual Medicaid enrollee may not be held responsible for payments due to emergency treatment, *id.* § 1396u-2(b)(6), the reference to "payment" in this section can only refer to payments owed to a healthcare provider. *See also id.* § 1396u-2(a)(5)(B)(iii) (MCOs shall make information available regarding, among other things, "[t]he procedures available to an enrollee *and a health care provider* to challenge or appeal the failure of the [managed care] organization to cover a service" (emphasis added)). It is evident, therefore, that in enacting the managed care provision, Congress considered the circumstances of jilted healthcare providers such as PGHC, and with respect to such providers, established what—in Congress's view—was the appropriate remedy for an MCO's denial of payment for emergency services or other treatment. PGHC's position is thus no different than the 340B Entities in *Astra*, and in that case, the Supreme Court found that the existence of an extra-judicial dispute resolution system, coupled with the lack of a private right of action under the relevant statute, was conclusive evidence that Congress had foreclosed third parties from bringing "a multitude of dispersed and uncoordinated lawsuits" to enforce the terms of the statute. *Astra*, 131 S. Ct. at 1349.

The same conclusion follows inescapably here. To be sure, as PGHC points out (Pl.'s Br. at 5), the grievance procedure that is available to it under the managed care provision is not as robust as the one that propelled the Supreme Court to its unanimous conclusion in the *Astra* case. *Compare Astra*, 131 S. Ct. at 1350 (noting that the statutory scheme at issue "directed [an agency of HHS] to create a formal dispute resolution procedure, institute refund and civil penalty systems, and perform audits of manufacturers"), *with* 42 U.S.C. § 1396u-2(b)(4) (requiring MCOs to establish internal grievance procedures for members or providers). However, the lack of an independent dispute resolution system or any additional grievance procedures for healthcare providers who seek reimbursement from MCOs for emergency services rendered is surely a difference of degree, not type. The salient inquiry is whether Congress has provided an extra-judicial mechanism for resolving such disputes, *see Astra*, 131 S. Ct. at 1350, and for the reasons set forth above, it is clear that Congress intended disputes related to MCO reimbursements to be addressed by those entities' statutorily-mandated grievance procedures, not through the courts.

As a final observation, this Court notes that the fact that PGHC cannot sue Advantage as a third-party beneficiary does not necessarily mean that there is no recourse for flagrant violations of the terms of the emergency care reimbursement agreements that MCOs such as Advantage make with states. The managed care provision of the Medicaid statute sets forth extensive sanctions for non-compliance that must be included as a term in any contract between a state and an MCO. *See* 42 U.S.C. § 1396u-2(e). These sanctions include statutory damages, financial and administrative penalties, and termination of the contract between an MCO and a local government. *Id.*

And, as required by law, Advantage's contracts with the District expressly incorporate these provisions. (*See* 2000 Contract at 44-45; 2002 Contract at 182.) What is more, the contracts between Advantage and the District also require Advantage to provide regular reports to the District regarding Advantage's grievance procedures. (*See, e.g.*, 2000 Contract at 11 (providing, in Section E.4, that "[Advantage] shall furnish to the District on a quarterly basis . . . [a] description of each grievance filed and the status and timing of the resolution").) The threat of sanctions and the reporting requirements permit the District to monitor Advantage's performance, and these mechanisms are clearly designed to incentivize compliance with the terms of the contractual agreement. Indeed, there is no shortage of examples throughout the country of states using sanctions to enforce compliance. *See, e.g.*, Jasir Jawaid, *NY Fines Excellus Health Plan*, SNL Insurance Daily, Apr. 23, 2012, *available at* 2012 WLNR 8899773 (insurer fined nearly $1 million for denying emergency services claims); *State Briefs*, Managed Care Week, Sept. 13, 1999, *available at* 1999 WLNR 8251398 (insurer in Washington state fined $250,000 for improper denial of emergency coverage); *see also* Bob LaMendola, *Florida Fines Humana $3.4 Million for Slow Reports of Suspected Fraud*, Sun-Sentinel, Aug. 18, 2011, *available at* 2011 WLNR 16450486 (fine imposed on an insurer where the insurer's "failure to disclose the fraud violate[d] the terms of its contract as a Medicaid [MCO]").

The fact that the Medicaid statute expressly authorizes such sanctions further underscores that it was Congress's intent for states themselves—rather than private third parties—to police compliance with the requirements of the Medicaid program. *See* 42 U.S.C. § 1396u-2(e). PGHC has not demonstrated that the result should be any

different where, as here, Congress not only enacted the statutory requirement at issue (*e.g.*, the emergency services section of the managed care provision) but also mandated that this requirement be incorporated into the contractual agreements that states make with managed care providers.  The contracts between the Advantage and the District do no more than incorporate the emergency services section of the Medicaid statute's managed care provision—a provision that is not enforceable by private right of action under the statute.  Consequently, a third-party suit to enforce Advantage's contractual promise to honor the statutory emergency services requirement cannot be countenanced.

## IV.    CONCLUSION

The contracts between Advantage and the District evidence no intention to benefit third parties such as PGHC apart from the Medicaid statute's emergency care reimbursement requirement, and to allow PGHC's third-party claim would undermine the congressionally-mandated system for an MCO's compliance with the managed care provision of the Medicaid statute.  Therefore, the Court's prior conclusion that PGHC can proceed in it claim against Advantage as a third-party beneficiary is clearly erroneous and Advantage's Motion for Reconsideration must be **GRANTED**.

Moreover, given that the Court has already dismissed PGHC's other causes of action, PGHC is left with no grounds upon which this Court can grant the relief requested in the complaint.  Thus, even taking all of PGHC's factual allegations as true, PGHC has not pled a plausible legal theory under which it can recover.  Accordingly, as

set forth in the separate order issued concurrently with this opinion, PGHC has failed to state a claim upon which relief can be granted, and the case must be **DISMISSED** in its entirety.

Date:  October 21, 2013

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge